IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

No. 16-0670

**FILED**

**February 9, 2017**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

In the Matter Of:


THE HONORABLE STEPHEN O. CALLAGHAN,
JUDGE-ELECT OF THE TWENTY-EIGHTH JUDICIAL CIRCUIT

---

DISCIPLINARY PROCEEDING

SUSPENDED WITHOUT PAY
AND OTHER SANCTIONS

---

Submitted: January 24, 2017
Filed: February 9, 2017


Teresa Tarr, Esq.
Brian Lanham, Esq.
Judicial Disciplinary Counsel
Charleston, West Virginia
Attorneys for West Virginia Judicial
Investigation Commission

Lonnie C. Simmons, Esq.
DiTrapano, Barrett, DiPiero, McGinley
& Simmons, PLLC
Charleston, West Virginia
Attorney for Respondent


ACTING CHIEF JUSTICE THOMAS E. MCHUGH delivered the Opinion of the Court. JUDGE MATISH concurs in part and dissents in part and reserves the right to file a separate opinion.

CHIEF JUSTICE LOUGHRY, JUSTICE DAVIS, JUSTICE WORKMAN, JUSTICE KETCHUM, and JUSTICE WALKER, deeming themselves disqualified, did not participate in the decision of this case.

SENIOR STATUS JUSTICE THOMAS E. MCHUGH, JUDGE ROBERT A. WATERS, JUDGE JAMES A. MATISH, JUDGE H. CHARLES CARL, III, and JUDGE JOANNA I. TABIT, sitting by temporary assignment.

SYLLABUS BY THE COURT

1.      "'The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings.' Syl. pt. 1, *W. Va. Judicial Inquiry Commission v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980)." Syl., *Matter of Hey*, 193 W.Va. 572, 457 S.E.2d 509 (1995).

2.      "'"Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.'" Syllabus Point 4, *In Re Pauley*, 173 W.Va. 228, 235, 314 S.E.2d 391, 399 (1983).' Syllabus Point 1, *Matter of Hey*, 192 W.Va. 221, 452 S.E.2d 24 (1994)."  Syl. Pt. 1, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

3.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert denied*, 470 U.S. 1028, 105 S. Ct. 1395, 84 L.Ed.2d 783 (1985).

4.      "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of

i

the members of the judiciary and the system of justice." Syl., *In the Matter of Gorby*, 176 W.Va. 16, 339 S.E.2d 702 (1985).

5. The provisions of the West Virginia Rules of Judicial Disciplinary Procedure are applicable in their entirety to "judicial candidates" as defined in the West Virginia Code of Judicial Conduct, and permit the exercise of authority over said candidates for all purposes articulated therein.

6. "The West Virginia Constitution confers on the West Virginia Supreme Court of Appeals, both expressly and by necessary implication, the power to protect the integrity of the judicial branch of government and the duty to regulate the political activities of all judicial officers." Syl. Pt. 6, *State ex rel. Carenbauer v. Hechler*, 208 W. Va. 584, 542 S.E.2d 405 (2000).

7. Insofar as West Virginia Code of Judicial Conduct Rule 4.1(A)(9) and West Virginia Rule of Professional Conduct 8.2(a) prohibit lawyers, judges and judicial candidates from knowingly, or with reckless disregard for the truth, making a false statement as more fully proscribed therein, they are facially constitutional under the First Amendment to the United States Constitution.

8. "The law . . . takes but one approach to the question of falsity, regardless of the form of the communication. It overlooks minor inaccuracies and

concentrates upon substantial truth. Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the [] charge be justified. A statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Syl. Pt. 4, in part, *State ex rel. Suriano v. Gaughan*, 198 W.Va. 339, 480 S.E.2d 548 (1996).

9. "This Court has the inherent power to inquire into the conduct of justices, judges and magistrates, and to impose any disciplinary measures short of impeachment that it deems necessary to preserve and enhance public confidence in the judiciary." Syl. Pt. 8, *In re Watkins*, 233 W.Va. 170, 757 S.E.2d 594 (2013).

10. "[I]t is clearly within this Court's power and discretion to impose multiple sanctions against any justice, judge or magistrate for separate and distinct violations of the Code of Judicial Conduct and to order that such sanctions be imposed consecutively." Syl. Pt. 7, in part, *In re Watkins*, 233 W.Va. 170, 757 S.E.2d 594 (2013).

11. "Pursuant to article VIII, section 8 of the *West Virginia Constitution*, this Court has the inherent and express authority to 'prescribe, adopt, promulgate and amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and magistrates, along with sanctions and penalties for any violation thereof[.]'" Syl. Pt. 5, *Comm. On Legal Ethics v. Karl*, 192 W.Va. 23, 449 S.E.2d 277 (1994).

12. "Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist." Syl. Pt. 3, *In re Cruickshanks*, 220 W.Va. 513, 648 S.E.2d 19 (2007).

MCHUGH, Acting Chief Justice:

This matter arises from the recommendation of the West Virginia Judicial Hearing Board (hereinafter "the Board") that respondent Stephen O. Callaghan, Judge-Elect of the 28th Judicial Circuit (hereinafter "Judge-Elect Callaghan") be disciplined for three violations of the West Virginia Code of Judicial Conduct and one violation of the West Virginia Rules of Professional Conduct. These violations stem from allegedly false statements contained in a campaign-issued flyer disseminated while Judge-Elect Callaghan was a candidate for Judge of the 28th Judicial Circuit. He objects to the findings and sanctions recommended by the Board and before this Court asserts 1) that neither Judicial Disciplinary Counsel nor the Board had jurisdiction to prosecute and hear the charges asserted against him since he was not a judge at the time of the alleged violations; 2) that the statements are protected by the First Amendment; and 3) that the recommended discipline of a one-year suspension without pay and other sanctions is excessive. Judicial Disciplinary Counsel likewise objects to the recommended discipline, requesting a two-year suspension.

This Court has before it all matters of record, including the stipulations, exhibits and a transcript of the evidentiary hearing conducted by the Board, as well as the briefs and argument of counsel. Based on this Court's independent review of the record, we find that clear and convincing evidence of improper conduct has been presented in support of each of the violations found by the Board and that Judge-Elect Callaghan's constitutional arguments afford him no relief. Further, we adopt the Board's

1

recommended discipline, with modification, and find that, under the unique circumstances presented herein, it is appropriate to suspend Judge-Elect Callaghan from the judicial bench for a total of two years without pay, along with the recommended fine of $15,000.00, and reprimand as an attorney. The Court further directs Judge-Elect Callaghan to pay the costs of the proceedings.

## I.  FACTS AND PROCEDURAL HISTORY

On May 11, 2015, Judge-Elect Callaghan filed pre-candidacy papers to run for Judge of the 28th Judicial Circuit.  On November 24 and December 30, 2015, the West Virginia Judicial Investigation Commission ("JIC") sent a letter to all candidates advising them of the applicability of Rule 4.1 of the West Virginia Code of Judicial Conduct, entitled "Political and Campaign Activities of Judges and Judicial Candidates in General."  On January 14, 2016, Judge-Elect Callaghan filed his candidacy papers; his opponent was the incumbent Honorable Gary L. Johnson (hereinafter "Judge Johnson").

In late January 2016, upon the advice of his campaign consultant, Brad Heflin of Rainmaker, Inc., Judge-Elect Callaghan commissioned and approved an automated survey, in part, to test the effect of connecting Judge Johnson's attendance at a child trafficking seminar in Washington, D. C. with the loss of coal jobs in Nicholas County, which losses had been widely associated with President Barack Obama's

2

policies.[1]  The specific survey question stated: "Gary Johnson is lockstep with Barack Obama's policies.  While Nicholas County was losing coal jobs to Obama's policies, Johnson was the only West Virginia judge invited to the Obama White House to participate in a junket highlighting issues of importance to President Obama."  The survey then asked the participant to rate whether this statement caused major concern, some concern, no real concern, or "don't know."  Approximately 67% of those surveyed responded that this statement caused them "major concern" or "some concern."[2]

The genesis of the survey question is Judge Johnson's June 2015 attendance at a Court Improvement Program ("CIP") meeting and Child Trafficking Conference in Washington, D. C.  As a recipient of three federal CIP grants, the State was required to send a representative for each such grant to the annual CIP Grantee meeting; Judge Johnson was the Chair of the West Virginia CIP.  At the same time as the CIP Grantee Meeting, the Federal Administration for Children and Families held a

---

[1]A 2015 Gallup poll revealed that President Obama had a 72% disapproval rating in West Virginia.  *See* http://www.gallup.com/poll/189002/obama-rated-best-hawaii-2015-worst-west-virginia.aspx (last visited February 8, 2017).  As stated in his response to the Statement of Charges:  "To the extent some citizens of Nicholas County may have the opinion that *any* association between Judge Johnson and President Obama is completely unacceptable, regardless of the circumstances, Mr. Callaghan sought to create advertising consistent with that opinion. . . ." (emphasis in original).

[2] The polling results submitted into evidence demonstrate that when asked which candidate they were likely to vote for both before and after this statement, the number of individuals indicating they would likely vote for Judge Johnson was reduced by approximately 9%.  Judge-Elect Callaghan's ultimate margin of victory against Judge Johnson was 3.38%.  *See* n.6, *infra*.

seminar on child trafficking; the agency encouraged the States to send their highest level representatives. In an unrelated occurrence that same month, a press report was issued detailing the loss of 558 coal jobs in Nicholas County between 2011 and 2015.

Following the survey, Judge-Elect Callaghan approved a direct-mail flyer created by Mr. Heflin emblazoned with "photoshopped"[3] photographs of President Obama and Judge Johnson, along with the caption "Barack Obama & Gary Johnson Party at the White House . . . ." President Obama is depicted holding what appears to be an alcoholic beverage and party streamers form the background of the photographs. *See* Exhibit "A" attached to this opinion. The opposing side of the flyer concludes ". . . While Nicholas County loses hundreds of jobs." The opposing side also contains a mock-up of a "Layoff Notice" which states:

> While Nicholas County lost hundreds of jobs to Barack Obama's coal policies, Judge Gary Johnson *accepted an invitation from Obama* to come to the White House to support Obama's legislative agenda. That same month, news outlets reported a 76% drop in coal mining employment. **Can we trust Judge Gary Johnson to defend Nicholas County against job-killer Barack Obama**?

(emphasis added). The flyer was mailed to voters in Nicholas County on or about May 5, 2016, five days before the May 10, 2016, election, as agreed by Judge-Elect Callaghan

---

[3] This was the term utilized by Mr. Heflin during his testimony before the Board.

and Mr. Heflin.[4]  The flyer was also posted on Judge-Elect Callaghan's personal and campaign Facebook pages.

It is undisputed herein that Judge Johnson was not "invited by" President Obama to attend the CIP meeting and Child Trafficking conference, did not meet President Obama, has never met President Obama, and did not attend a "party" or any social function, much less one involving alcohol, while at the meeting and seminar.  It also appears that while conference meetings were held at buildings within the White House compound, Judge Johnson did not actually go to The White House.

Upon receipt of the subject flyer, Judge Johnson notified Judge-Elect Callaghan of his objection to the flyer and demanded that he take action to counter-act the effect of the flyer.  Judicial Disciplinary Counsel contacted Judge-Elect Callaghan as well, further advising him that the flyer was inappropriate and demanding remediation. The record demonstrates that Nicholas County's only newspaper is published and circulated only on Wednesdays, allowing no opportunity to run an ad addressing the flyer before the following Tuesday's election.  Therefore, as a result of these discussions and in an effort to avoid the filing of a judicial ethics complaint by Judge Johnson or Judicial

---

[4] In addition to this flyer, Judge-Elect Callaghan also sent four additional flyers on various topics such as drug abuse, drug court, and a "teen court." *See infra*.

Disciplinary Counsel,[5] Judge-Elect Callaghan agreed to remove the flyer from his personal and campaign Facebook pages and run eight local radio ads over a three-day period stating:

> If you received a mail advertisement recently from Steve Callaghan, Candidate for Nicholas County Circuit Judge, showing Judge Gary Johnson visiting the White House, please understand that the specific characterization of the White House visit *may be inaccurate and misleading and should not have been sent* containing the *inappropriate* information. Candidate Callaghan apologizes for any misunderstanding or *inaccuracies. . . .*"

(emphasis added). On May 10, 2016, Judge-Elect Callaghan defeated Judge Johnson by 227 votes.[6]

On July 18, 2016, a Formal Statement of Charges was issued against Judge-Elect Callaghan by the JIC.[7] On November 29, 2016, after hearing evidence, the Board

---

[5] Both Judicial Disciplinary Counsel and Judge Johnson indicated to Judge-Elect Callaghan that this action would be sufficient to deter either of them from filing or initiating a judicial complaint. The complaint filed in this matter was ultimately filed by Judge Johnson's son, Nicholas Johnson.

[6] Out of 6,717 votes cast, Judge-Elect Callaghan received 3,472 and Judge Johnson received 3,245.

[7] Judge-Elect Callaghan was originally charged under a single count with eight separate violations: Rule 4.1(A)(9) and (B), Rule 4.2(A)(1), (3), (4) and (5) of the West Virginia Code of Judicial Conduct (2015), as well as Rule 8.2(a) and (b) of the West Virginia Rules of Professional Conduct (2015). Judicial Disciplinary Counsel later voluntarily dismissed the violation of Rule 4.2(A)(3), requiring a candidate to review and approve all campaign statements and materials inasmuch as Judge-Elect Callaghan admitted he reviewed and approved the subject flyer.

issued a Recommended Decision pursuant to Rule 4.8 of the West Virginia Rules of Judicial Disciplinary Procedure, finding that he violated Rules 4.1(A)(9), 4.2(A)(1), 4.2(A)(4) of the Code of Judicial Conduct and Rule 8.2(a) of the Rules of Professional Conduct.[8] Disciplinary Counsel requested a one-year suspension for the Professional Conduct violation and a one-year suspension for the Judicial Code violations to run *consecutively*, for a total of a two-year suspension. Instead, the Board recommended a one-year suspension without pay for *each* of the four violations, to run *concurrently*, as well as censure, reprimand, a $5,000 fine per Judicial Code violation, and payment of costs. Judge-Elect Callaghan filed an objection to the recommended disposition pursuant to Rule of Judicial Disciplinary Procedure 4.11. As a result of the Board's one-year concurrent suspension, Disciplinary Counsel likewise objected to the recommended discipline, reiterating its request that a two-year suspension be ordered.

---

[8] With respect to the remaining charged violations, the Board found that there was not clear and convincing evidence that Judge-Elect Callaghan violated Rule 4.2(A)(5) of the Code of Judicial Conduct, which requires a candidate to "take corrective action if he or she learns of any misrepresentations made in his or her campaign statements or materials." The Board found that his attempts "however feeble" to rectify the "inaccurate and misleading" characterizations in the flyer precluded a finding that he violated this Rule. In addition, the Board found a separate charge under Rule 8.2(b) of the Rules of Professional Conduct requiring a lawyer who is a judicial candidate to comply with the Code of Judicial Conduct to be redundant and therefore made no finding in that regard. The Board further found that the language of Rule 4.1(B) of the Code of Judicial Conduct requiring a candidate to "take reasonable measures" to ensure that others do not undertake prohibited activities to be duplicative of the language contained in Rule 4.2(A)(4) containing a similar requirement and therefore made findings only on the latter charge.

7

## II. STANDARD OF REVIEW

With respect to discipline for violations of the West Virginia Code of Judicial Conduct, "'[t]he Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings.' Syl. pt. 1, *W. Va. Judicial Inquiry Commission v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980)." Syl., *Matter of Hey*, 193 W.Va. 572, 457 S.E.2d 509 (1995). "The independent evaluation of the Court shall constitute a *de novo* or plenary review of the record." *Matter of Starcher*, 202 W. Va. 55, 60, 501 S.E.2d 772, 777 (1998). Moreover, "'""Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.'" Syllabus Point 4, *In Re Pauley*, 173 W.Va. 228, 235, 314 S.E.2d 391, 399 (1983).' Syllabus Point 1, *Matter of Hey*, 192 W.Va. 221, 452 S.E.2d 24 (1994)." Syl. Pt. 1, *Starcher*, 202 W. Va. 55, 501 S.E.2d 772.

Likewise, with respect to lawyer disciplinary matters, "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert denied*, 470 U.S. 1028, 105 S. Ct. 1395, 84 L.Ed.2d 783 (1985). A *de novo* standard similarly applies. Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

Moreover, insofar as Judge-Elect Callaghan challenges the constitutionality, both facially and as-applied, of the Rules which he was charged with violating, our review is plenary. "Constitutional challenges . . . are reviewed pursuant to a *de novo* standard of review." *In re FELA Asbestos Cases*, 222 W. Va. 512, 514, 665 S.E.2d 687, 689 (2008). Standards for imposition of discipline are discussed in greater detail, *infra*. Therefore, with these standards in mind, we proceed to the substance of the presented objections.

### III. DISCUSSION

The Board found that Judge-Elect Callaghan violated the following provisions of the West Virginia Code of Judicial Conduct:

> Rule 4.1(A)(9): ". . . [A] judge or a judicial candidate shall not . . . knowingly, or with reckless disregard for the truth, make any false or misleading statement[.]"
>
> Rule 4.2(A)(1): "A judge or candidate subject to public election shall . . . act at all times in a manner consistent with the independence, integrity, and impartiality of the judiciary[.]"
>
> Rule 4.2(A)(4): "A judge or candidate subject to public election shall . . . take reasonable measures to ensure that other persons do not undertake on behalf of the candidate activities . . . that the candidate is prohibited from doing by Rule 4.1[.]"

and the following provision of the West Virginia Rules of Professional Conduct:

> Rule 8.2(a): "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a

9

candidate for election or appointment to judicial or legal office."

Judge-Elect Callaghan raises three objections to the Board's recommended decision, as follows: 1) Judicial Disciplinary Counsel has no authority to prosecute, nor does the Board have jurisdiction to hear, matters involving a judicial candidate who is not a "judge" because the Rules of Judicial Disciplinary Procedure make no reference to "judicial candidates"; 2) the language in the subject flyer was speech protected by the First Amendment either because it is objectively or substantially true and/or rhetorical hyperbole or parody; and 3) the recommended discipline is excessive. We begin, as we must, with Judge-Elect Callaghan's jurisdictional challenge to Judicial Disciplinary Counsel's prosecution of the charges against him and the Board's authority to hear such charges and recommend discipline.

## A. *Jurisdiction of the Board and Judicial Disciplinary Counsel*

The West Virginia Code of Judicial Conduct contains provisions expressly applicable to judicial candidates. *See* W. Va. Code of Jud. Cond., *Application*, Section I(B) ("All *judicial candidates* for judicial office shall comply with the applicable provisions of this Code." (emphasis added)); *Preamble* ("The West Virginia Code of Judicial Conduct establishes standards for the ethical conduct of judges and *judicial candidates*." (emphasis added)). In fact, Canon 4 deals exclusively with campaign activity by judges and "candidates." Rules 4.1 and 4.2 contain general prohibitions and affirmative obligations relative to "Political and Campaign Activities of Judges and

10

*Judicial Candidates*." (emphasis added). The remaining Rules within this Canon deal with activities of candidates for appointive judicial office, candidates for non-judicial office, and campaign committees. *See* Rules 4.3, 4.4, and 4.5. As indicated above, each of the Judicial Rule violations found by the Board expressly applies to "judicial candidates." Judge-Elect Callaghan does not dispute that he qualifies as a "judicial candidate" as defined by the Code of Judicial Conduct,[9] nor does he dispute that the Code properly governs the conduct of judicial candidates.

Rather, he argues that because the West Virginia Rules of Judicial Disciplinary Procedure make no express reference to "judicial candidates" and refer only to "judges" in outlining the disciplinary procedures, neither Judicial Disciplinary Counsel nor the Board have "jurisdiction" to prosecute and hear charges against a judicial candidate who is not a judge. Noting the absence of any reference in the entire collection of procedural rules to "judicial candidate," he specifically highlights the reference to and

---

[9] The *Terminology* section of the Code of Judicial Conduct defines "judicial candidate" as:

> any person, including a sitting judge, who is seeking selection for or retention in judicial office by election or appointment. A person becomes a candidate for judicial office as soon as he or she makes a public announcement of candidacy, declares or files as a candidate with the election or appointment authority, authorizes or, where permitted, engages in solicitation or acceptance of contributions or support, or is nominated for election or appointment to office.

11

definition of "judge" contained in Rule of Judicial Disciplinary Procedure 2, which states:

> Any person may file a complaint against a "judge" with the Office of Disciplinary Counsel regarding a violation of the Code of Judicial Conduct. The term "judge" is defined in the Code of Judicial Conduct as "Anyone, whether or not a lawyer, who is an officer of a judicial system and who performs judicial functions, including but not limited to Justices of the Supreme Court of Appeals, Circuit Judges, family court judges, Magistrates, Mental Hygiene Commissioners Juvenile Referees, Special Commissioners and Special Masters."[10]

(footnote added). Judge-Elect Callaghan maintains that this incongruence between the Code of Judicial Conduct and the Rules of Judicial Disciplinary Procedure serves to strip Judicial Disciplinary Counsel and the Board of any authority to prosecute charges and/or recommend discipline against him.

> The West Virginia Constitution article VIII, section eight provides that

> [u]nder its inherent rule-making power, which is hereby declared, the supreme court of appeals shall, from time to time, prescribe, adopt, promulgate and amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and magistrates, along with sanctions and penalties for any violation thereof, and the supreme court of appeals is authorized to censure or temporarily suspend any justice, judge or magistrate having the judicial power of the state,

---

[10] The Code of Judicial Conduct no longer contains a definition for "judge," given the substantial 2015 amendments, describing instead the "applicability" of the Code of Conduct. Moreover, as pertains to Canon 4's express reach over "judicial candidates," it appears simply that the procedural rules were not modified to comport with the specific language in the Code of Judicial Conduct.

12

> including one of its own members, for any violation of any
> such code of ethics, code of regulations and standards[.]

In exercise of that authority, this Court has held that "[t]he purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl., *In the Matter of Gorby*, 176 W.Va. 16, 339 S.E.2d 702 (1985). That such a goal must, at a minimum, begin by regulating the conduct of those who seek to become members of the judiciary hardly needs explication.[11]

Indeed as previously indicated, Judge-Elect Callaghan does not challenge this Court's authority, through the Code of Judicial Conduct, to regulate the activities of judicial candidates. Instead he argues that the disciplinary procedural rules do not expressly grant commensurate authority to Judicial Disciplinary Counsel or the Board to act upon or enforce such regulations against a non-incumbent, lawyer-candidate. Although this Court has not had occasion to specifically address the role of the Rules of

---

[11] Accordingly, the various iterations of our judicial code of conduct have historically swept broadly enough to regulate the conduct of judicial candidates. Canon 7(B)(1)(c) of West Virginia's long-standing Judicial Code of Ethics (1977) provided that "[a] candidate, including an incumbent judge, for a judicial office that is to be filled by public election between competing candidates . . . should not . . . misrepresent his identity, qualifications, present position, or other fact." On January 1, 1993, the Code of Judicial Conduct superseded the Code of Ethics and the corollary of this provision then provided that a candidate shall not "knowingly misrepresent the identity, qualification, present position or other fact concerning the candidate or an opponent[.]" Canon 5A(3)(d)(iii) (2015). In November 2015, the Court adopted the current Code of Judicial Conduct, which substantially revised the prior Code and more closely mirrors the 2007 Model Code of Judicial Conduct promulgated by the American Bar Association, containing the provisions cited above.

13

Judicial Disciplinary Procedure, it has examined the import of our other rules of procedure.

In *Arlan's Department Store of Huntington, Inc. v. Conaty*, 162 W. Va. 893, 897-98, 253 S.E.2d 522, 525 (1979), the Court observed as pertains to our functionally comparable Rules of Civil Procedure:

> The rules of civil procedure were designed to secure just, speedy and inexpensive determinations in every action. *Neither the West Virginia Rules of Civil Procedure nor the statutory rules of pleading, practice and procedure impermissibly restrict the jurisdiction of circuit courts in the constitutional sense. The rules of civil procedure do not restrict the original and general jurisdiction of courts of record in this State; they do not remove any class of cases or restrict the types of disputes which a circuit court has judicial jurisdiction to hear and adjudicate.* The rules do, however, establish procedures for the orderly process of civil cases as anticipated by W.Va. Const. Art. III, § 10. *They operate in aid of jurisdiction* and facilitate the public's interest in just, speedy and inexpensive determinations. They vindicate constitutional rights by providing for the administration of justice without denial or delay as required by W.Va. Const. Art. III, § 17.

(emphasis added). Accordingly, the *Arlan* Court tersely rejected a claim that procedural violations strip a court of jurisdiction: "Th[e] effect of noncompliance with the rules is not equivalent to impermissibly depriving the court of its constitutional power or jurisdiction, and to characterize it as such will not make it so." *Id*. at 898, 253 S.E.2d at 526. As more pointedly stated by the Ohio Supreme Court:

> It is well established that statutes establishing subject matter jurisdiction, which create and define the rights of parties to sue and be sued in certain jurisdictions, are substantive law.

14

> "If the statute is jurisdictional, it is a substantive law of this state, and cannot be abridged, enlarged, or modified by the Ohio Rules of Civil Procedure."

*Proctor v. Kardassilaris*, 873 N.E.2d 872, 876 (Ohio 2007) (quoting *Akron v. Gay*, 351 N.E.2d 475, 477 (Ohio 1976)).

Other courts take a similar view that procedural rules merely create a mechanism to vindicate the substantive law and therefore do not affect jurisdiction. "'[T]he basis for the exercise of judicial authority is normally found in jurisdictional statutes, not in the language of procedural rules.'" *Interest of Clinton,* 762 P.2d 1381, 1388 (Colo. 1988) (*en banc*) (quoting *White v. Dist. Court,* 695 P.2d 1133, 1135 (Colo. 1984)). In *Levin v. Anouna*, 990 P.2d 1136, 1138 (Colo. App. 1999), the Colorado Court of Appeals stated that "a procedural statute or a court rule normally does not address jurisdictional issues; restrictions upon a court's jurisdiction are generally to be found in statutes directly addressing that subject." While acknowledging that a "procedural defect result[ing] from a failure to comply with an essential requirement . . . may constitute reversible error," the court found that such procedural requirements do not implicate its jurisdiction. *Id.*

The import of these decisions is that procedural rules are not designed to either establish or affect jurisdiction. Accordingly, it is clear that it is the Code of Judicial Conduct that provides the substantive, jurisdictional requirements for exercising discipline over Judge-Elect Callaghan; the rules of disciplinary procedure are merely

15

that—procedural mechanisms for the exercise of that jurisdiction. Any technical deficiency in the verbiage of the procedural rules does not serve to eradicate the unmistakable grant of authority contained in the Code of Judicial Conduct to Judicial Disciplinary Counsel and the Board to investigate, prosecute, and hear matters involving violations thereof.

Moreover, even a hyper-technical reading of the Rules of Judicial Disciplinary Procedure reveals sufficient breadth in its description of the Board's authority to allow for the prosecution and discipline of non-incumbent lawyer-candidates for the judiciary. Both Rule 1.11 and 3.11 permit the JIC and Board to "engage in such other activities related to judicial discipline as it deems appropriate[.]" In fact, Rule 5.4 expressly directs Disciplinary Counsel to "prosecute violations of the Code of Judicial Conduct . . . before the . . . Judicial Hearing Board[.]" We therefore reject Judge-Elect Callaghan's contention that, as a non-incumbent, lawyer-candidate, neither Judicial Disciplinary Counsel nor the Board have authority or jurisdiction over him for violations of the Code of Judicial Conduct, as set forth therein.

To find otherwise would, as the Board concluded, create an inequity where judicial candidates who are judges are held to the standards set forth in the Code of Judicial Conduct, but lawyer-candidates are not. The Oregon Supreme Court similarly noted and rejected the imbalance such an interpretation would make:

> It is equally clear that to apply the limitations of Canon 7 B(7) to sitting judges, while allowing their as-yet-unelected

16

> opponents to campaign unfettered by Canon 7B(7), would create an advantage for the challenger. The legislature did not intend the Commission to have so little and so ineffective jurisdiction over judicial activity.

*In re Fadeley*, 802 P.2d 31, 36 (Ore. 1990). *See also Wolfson v. Concannon*, 811 F.3d 1176, 1191 (9th Cir. 2016) (Berzon, Cir. J., concurring) ("[S]tricter restrictions during judicial campaigns . . . for sitting judges than for nonincumbent candidates for judicial positions would create [] disparity[.]").[12] We therefore expressly hold that the provisions of the West Virginia Rules of Judicial Disciplinary Procedure are applicable in their entirety to "judicial candidates" as defined in the West Virginia Code of Judicial Conduct, and permit the exercise of authority over said candidates for all purposes articulated therein.

---

[12] We find Judge-Elect Callaghan's passing assertion that this incongruity is resolved by construing the Rules to require violations of the Code of Judicial Conduct by lawyer-candidates to be "handled by the West Virginia Lawyer Disciplinary Board" unavailing. As he correctly notes, both Judicial Disciplinary Counsel and Lawyer Disciplinary Counsel have overlapping authority to investigate and prosecute violations of the Code of Judicial Conduct or Rules of Professional Conduct as per Rule 4 of the Rules of Lawyer Disciplinary Procedure.

However, the Hearing Panel Subcommittee of the Lawyer Disciplinary Board acts upon "formal charges filed by the Investigative Panel." W. Va. R. L. Disc. Proc. 3. The Investigative Panel, concomitantly, has authority to find probable cause for "a violation of the *Rules of Professional Conduct*." W. Va. R. L. Disc. Proc. 2, 2.9(a) (emphasis added). Moreover, the Hearing Panel Subcommittee is granted authority to sanction for "a violation of the Rules of Professional Conduct." W. Va. R. L. Disc. Proc. 3.15. Therefore, the Hearing Panel Subcommittee has no authority to hear charges involving violations of the Code of Judicial Conduct. The Board's near-comprehensive authority over judges and conduct governed by the Code of Judicial Conduct is further demonstrated by Rule 3.12 which provides that even when judges are charged with violation of the Rules of Professional Conduct, the Board maintains exclusive jurisdiction over such discipline. W. Va. R. Jud. Disc. Proc. 3.12.

Having concluded that Judicial Disciplinary Counsel and the Board permissibly exercised jurisdiction over Judge-Elect Callaghan in prosecuting, hearing, and acting upon the charges against him, we now proceed to examine his substantive objections to the Board's findings and recommended discipline.

**B.    *First Amendment Challenge to Rule 4.1(A)(9) and Rule 8.2(a)***

As discussed above, the Board concluded that the subject flyer violated Rule 4.1(A)(9) of the Code of Judicial Conduct which forbids judicial candidates from "knowingly, or with reckless disregard for the truth, mak[ing] any false or misleading statement[.]"  Commensurately, the Board found the subject flyer violated Rule 8.2(a) of the Rules of Professional Conduct which similarly prohibits a lawyer from making "a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge . . . [or] a candidate for election . . . to judicial . . .office."[13]  By authorizing the creation and mailing of the subject flyer by his campaign consultant, the Board concluded that Judge-Elect Callaghan also violated Rule 4.2(A)(4) which requires a candidate to take "reasonable measures to

_____

[13] In the interest of brevity and given the similarity between the "false statement" prohibitions contained in Rule 4.1(A)(9) of the Code of Judicial Conduct and Rule 8.2(a) of the Rules of Professional Conduct, our analysis herein of the substance of Rule 4.1(A)(9) should be read as equally applicable to Rule 8.2(a).  We expressly note that Judge-Elect Callaghan makes no separate constitutional challenge to Rule 8.2(a) that differs from that which he advances against Rule 4.1(A)(9).  *See In re Chmura,* 608 N.W.2d 31, 43 n.11 (Mich. 2000) (summarily applying analysis of judicial canon restricting judicial candidate's speech to companion Rule of Professional Conduct similarly restricting lawyer's speech about judges and other public legal officers).

18

ensure that other persons do not undertake on behalf of the candidate activities . . . that the candidate is prohibited from doing by Rule 4.1[.]"  Finally, as a result of the foregoing, the Board further found that Judge-Elect Callaghan failed to "act at all times in a manner consistent with the independence, integrity, and impartiality of the judiciary," in violation of Rule 4.2(A)(1).

Judge-Elect Callaghan argues that the Board's recommended discipline, all of which is based upon the statements made in the subject flyer, violates his right to free speech under the First Amendment to the United States Constitution.[14]  He asserts that all of the statements contained in the subject flyer are either objectively true, "substantially true" or "rhetorical hyperbole/parody," all of which is protected speech.  He argues that the flyer simply took two unrelated facts—Judge Johnson's attendance at a federal

---

[14] The First Amendment to the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Although not referenced by Judge-Elect Callaghan, the West Virginia Constitution likewise provides:

> No law abridging the freedom of speech, or of the press, shall be passed; but the Legislature may, by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.

W. Va. Const. art. III, § 7.

seminar and coal job losses in Nicholas County—and juxtaposed them, allowing the public to draw any inferences it saw fit. The Board concluded that the statements in the subject flyer were not entitled to First Amendment protection and were materially false in violation of the Rules set forth hereinabove.[15]

---

[15] The Board crafted a separate order entered in advance of the hearing denying Judge-Elect Callaghan's motion to dismiss the charges on constitutional grounds. Taking issue apparently with the Board's refusal to seek an advisory opinion from this Court regarding the constitutionality of the Rule violations with which he was charged, he now urges this Court to address the "serious procedural question" of whether administrative agencies have the authority to address constitutional issues. Subsequent to oral argument, Judge-Elect Callaghan submitted a notice of additional authorities containing an additional citation to a case in support of this issue and further suggesting that remand may be necessary, depending on this Court's ruling on the constitutional issue presented.

First, we observe that Judge-Elect Callaghan forced the issues before the Board by raising them in the context of a motion to dismiss, which necessarily must be ruled upon before proceeding to disposition. Secondly, before this Court, he cites no authority suggesting that an agency must first seek a court ruling on the constitutionality of the rules it is charged with enforcing before acting. In fact, the cases he cites merely protect the right of one who *challenges* the constitutionality of a rule to seek declaratory judgment in the proper forum. Judge-Elect Callaghan apparently declined to do so in this case, preserving his constitutional challenge for presentation to this Court upon consideration of the recommended disposition.

Moreover, none of the cases cited suggest that the agency cannot act upon its rules in the face of a constitutional challenge; in fact, they demonstrate the opposite. In each case, the agency before which the constitutional challenge was raised acted with the presumption that its rules and actions were constitutional and reserved to the appropriate judicial forum the final resolution of constitutionality. That is precisely what has occurred in this case. In fact, the leading case cited in support of the proposition that the Board could not pass on the constitutionality of the Rules at issue states "although the general rule is that agencies do not have the authority to decide constitutional issues, agencies must consider and apply constitutional principles in determining procedures and rendering decisions in contested cases." *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 453 (Tenn. 1995). More specifically, "[w]hen the focus of an aggrieved (continued . . .)

1.     *Facial Constitutionality of Code of Judicial Conduct Rule 4.1(A)(9) and Rule of Professional Conduct 8.2(a)*

It is well-established that "speech about public issues and the qualifications of candidates for elected office commands the highest level of First Amendment protection." *Williams-Yulee v. The Fla. Bar*, 135 S. Ct. 1656, 1665 (2015). However, that being established, the United States Supreme Court has made clear that *judicial* candidates may be treated differently than political candidates for purposes of curtailing improper speech: "Judges are not politicians, even when they come to the bench by way of the ballot. And a State's decision to elect its judiciary does not compel it to treat judicial candidates like a campaigner for political office." *Id.* at 1662. In acknowledgment of this view, the commentary to our Rule 4.1 notes that "[t]he role of a judge is different from that of a legislator or executive branch official, even when the judge is subject to public election [and] [c]ampaigns for judicial office must be conducted differently from campaigns for other offices." W. Va. Code of Jud. Cond. 4.1 cmt. *See also* Randall T. Shepard, *Campaign Speech: Restraint and Liberty in Judicial Ethics*, 9 Geo. J. Legal Ethics 1059, 1067 (1996) ("The American tradition sets judges aside from the hurly-burly of sometimes unseemly political strife. We place courts and judges on a

---

party's claim is an 'as applied' challenge to the constitutionality of a statute or any challenge to the constitutionality of an agency rule, the agency may initially rule on the challenge." *Id*. at 455. *See also Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982) (criticizing disciplinary respondent for failing to raise constitutional challenge during disciplinary proceedings as there was nothing to indicate "the members of the Ethics Committee, the majority of whom are lawyers, would have refused to consider a claim that the rules which they were enforcing violated federal constitutional guarantees").

higher plateau and hope that in doing so they will act the part and ask us to do the same on matters of importance. Consignment of judges to regular rough-and-tumble politics makes the judiciary less capable of filling this role."). The *Williams-Yulee* Court explained further that since "the judiciary 'has no influence over either the sword or the purse; . . . neither force nor will but merely judgment[,]' . . . . [t]he judiciary's authority [] depends in large measure on the public's willingness to respect and follow its decisions." 135 S. Ct. at 1666 (citations omitted). In short, the bedrock of the public's submission to the judiciary's authority is the public's faith in its integrity, impartiality, and fairness.

With the critical understanding that "[s]tates may regulate judicial elections differently than they regulate political elections, because the role of judges differs from the role of politicians[,]" it is therefore incumbent upon this Court to determine if Rule 4.1(A)(9) of the Code of Judicial Conduct and Rule 8.2(a) of the Rules of Professional Conduct improperly infringe on the petitioner's First Amendment rights. *Id.* at 1667. The Supreme Court has explicitly held that "[a] State may restrict the speech of a judicial candidate only if the restriction is narrowly tailored to serve a compelling interest." *Id.* at 1665.

### a. *Existence of a Compelling State Interest*

Without question, this Court has previously recognized that "[t]he State has compelling interests in maintaining the integrity, independence, and impartiality of the judicial system—and in maintaining the appearance of the same—that justify unusually

22

stringent restrictions on judicial expression, both on and off the bench." *In the Matter of Hey*, 192 W. Va. 221, 227, 452 S.E.2d 24, 30 (1994). The United States Supreme Court has agreed: "We have recognized the 'vital state interest' in safeguarding 'public confidence in the fairness and integrity of the nation's elected judges.'" *Williams-Yulee*, 135 S. Ct. at 1666 (quoting *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)).[16] While "[t]he concept of public confidence in judicial integrity does not easily

---

[16] Similarly, and as pertains to the lawyer disciplinary penalty, this Court has expressly held with respect to lawyers' asserted free speech rights:

> The Free Speech Clause of the First Amendment protects a lawyer's criticism of the legal system and its judges, but this protection is not absolute. A lawyer's speech that presents a serious and imminent threat to the fairness and integrity of the judicial system is not protected. When a personal attack is made upon a judge or other court official, such speech is not protected if it consists of *knowingly false statements or false statements made with a reckless disregard of the truth. . . .*

Syl. Pt. 1, in part, *Comm. on Legal Ethics v. Douglas*, 179 W.Va. 490, 370 S.E.2d 325 (1988) (emphasis added). More recently, the Court held:

> . . . [A] statement by an attorney that such attorney knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office is not protected by the First Amendment as public speech on a matter of public concern where such statement is not supported by an objectively reasonable factual basis. The State's interest in protecting the public, the administration of justice, and the legal profession supports use of the objectively reasonable standard in attorney discipline proceedings involving disparagement of the credibility of the aforementioned judicial officers.

(continued . . .)

reduce to precise definition, nor does it lend itself to proof by documentary record[,] . . . no one denies that it is genuine and compelling." *Williams-Yulee,* 135 S. Ct. at 1667.

Although it is fairly inarguable that states have a compelling state interest in maintaining public confidence in their judiciary, we pause briefly in our analysis to give proper treatment specifically to West Virginia's wide-ranging measures to uphold the integrity and impartiality of judicial officials and candidates.[17] The West Virginia Code of Judicial Conduct requires that those within the judiciary "respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system." *Preamble*, W. Va. Code of Jud. Cond. It critically mandates that the judiciary "maintain the dignity of judicial office at all times, and avoid both impropriety and the

---

Syl. Pt. 5, in part, *Lawyer Disciplinary Bd. v. Hall*, 234 W. Va. 298, 765 S.E.2d 187, 190 (2014). *See also* n.13, *supra*.

[17] As explained by now-Chief Justice Loughry in his book about West Virginia election corruption:

> For too long, West Virginians have witnessed lying about candidates as a matter of tradition and expected behavior. The result, however, is that lying during a campaign erodes democracy, defames good people, and discourages others from even considering entering politics. There is simply no justification and no First Amendment right to lie and destroy someone's reputation and life. It amounts to obtaining a public office through stealth and deception and by robbing every voter of a fair election.

Allen H. Loughry, II, "Don't Buy Another Vote, I Won't Pay for a Landslide," 498 (McClain Printing Co. 2006). *See also Caperton,* 556 U.S. 868 (discussing effect of campaign contributions on obligation of West Virginia Supreme Court of Appeals justice to recuse himself).

appearance of impropriety . . . [and] aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence." *Id.* While not naive enough to suggest that the public believes the judiciary to be infallible, judicial officers and candidates must minimally conduct themselves such as to preserve the institutional veneration with which the judiciary is historically imbued. We agree whole-heartedly that

> [t]he public at large is entitled to honesty and integrity in judicial officials elected to mete out justice, apportion equity, and adjudicate disputes. We cannot ask for more, but we should certainly not expect less, particularly when it is the robed arbiter who, when administering the oath to witnesses, cautions them to tell the truth, the whole truth, and nothing but the truth.

*In re Lowery*, 999 S.W.2d 639, 663 (Tex. Rev. Trib. 1998).

That said, this Court is not blind to the "fundamental tension between the ideal character of the judicial office and the real world of electoral politics." *Chisom v. Roemer*, 501 U.S. 380, 400 (1991). *See In re Donohoe*, 580 P.2d 1093, 1097 (Wash. 1978) (*en banc*) (recognizing the "delicate balancing of rights involving the public, the incumbent judge, and the lawyer candidate for judicial office"). However, as this Court held in syllabus point six of *State ex rel. Carenbauer v. Hechler*, 208 W. Va. 584, 542 S.E.2d 405 (2000), "[t]he West Virginia Constitution confers on the West Virginia Supreme Court of Appeals, both expressly and by necessary implication, the *power* to protect the integrity of the judicial branch of government and the *duty* to regulate the *political activities* of all judicial officers." (emphasis added). Accordingly, the

25

requirements and prohibitions contained in our Code of Judicial Conduct carry out this Court's mandate to ensure that "integrity and impartiality" are visible, demonstrable qualities of our judicial candidates and not merely a meaningless ethical talisman. Significantly, judicial candidates willingly submit themselves and their campaigns to these restrictions. *See* Shepard, *supra* at 1060 ("The notion that judges must sacrifice many of their personal interests to the interests of the system and the litigants that it serves is ancient and widespread.").

Not only is protecting the integrity of the judiciary the constitutional duty of this Court, but it has likewise been woven into the fabric of public policy as expressed by our Legislature. In a measure that complements the Code of Judicial Conduct's distinguishing regulation of judicial campaigns, in 2015, the West Virginia Code was amended to make judicial elections non-partisan. *See* W. Va. Code §§ 3-5-6a through 6d (2015). This amendment represents an unmistakable Legislative mandate that West Virginia's judiciary must distance itself from the fray of partisan politics. These legislative and judicial constraints plainly seek to discourage—if not eradicate—within the judiciary, the type of distasteful and reckless campaign conduct which, quite unfortunately, is becoming increasingly more common with each passing election. "The citizenry cannot conceivably maintain faith in the judiciary's impartiality and integrity if it witnesses the slick, misleading advertisements and public mudslinging that candidates use to reach the bench every election year." Adam R. Long, *Keeping Mud Off the Bench: The First Amendment and Regulation of Candidates' False or Misleading Statements in*

26

*Judicial Elections*, Duke Law Journal, 787, 791 (Nov. 2001). These measures plainly seek to preserve not only the personal integrity and impartiality of the judicial candidates themselves, but more importantly, that of the institution.

This discussion leads us inexorably to the conclusion that, in terms of Judge-Elect Callaghan's challenge to the facial constitutionality of Rule 4.1(A)(9) and Rule 8.2(a), there is plainly a compelling state interest which justifies restricting judicial candidates' speech, which is undertaken both in his or her role as a judicial candidate and lawyer. The issue that remains is whether our Rules, as crafted, are sufficiently narrowly tailored to meet that compelling state interest.

### b. *Narrow Tailoring of Rule 4.1(A)(9) and 8.2(a)*

Code of Judicial Conduct Rule 4.1(A)(9) prohibits a judicial candidate from "*knowingly*, or with *reckless disregard for the truth*, mak[ing] any *false* or misleading statement[.]" (emphasis added). [18] The commentary to this Rule augments this

---

[18] Insofar as Judge-Elect Callaghan was not charged with, nor does the Board base its recommendation on, any alleged "misleading" statement, the issue of whether the "misleading" portion of Rule 4.1(A)(9) is constitutional is not squarely before the Court. *Accord Disciplinary Counsel v. Tamburrino,* 2016 WL 7116096, *4 (Ohio, Dec. 7, 2016) (declining to address constitutionality of "misleading" campaign speech prohibition because candidate was not charged with such). Given our conclusion that the subject flyer was materially false, we see no occasion herein to resolve the constitutionality of that portion of Rule 4.1(A)(9) prohibiting such statements. We do, however, note that such provisions in similar Rules have been widely found to be facially unconstitutional. *See Winter v. Wolnitzek*, 834 F.3d 681, 694 (6th Cir. 2016) ("[O]nly a ban on conscious falsehoods satisfies strict scrutiny."); *Butler v. Ala. Judicial Inquiry Comm'n*, 802 So.2d 207 (Ala. 2001); *Chmura*, 608 N.W.2d 31 (amending rule to eliminate unconstitutional (continued . . .)

prohibition by explaining that "[j]udicial candidates must be scrupulously fair and accurate in all statements made by them and by their campaign committees." Rule of Professional Conduct 8.2(a) similarly prohibits a lawyer from making "a statement that the lawyer *knows to be false or with reckless disregard as to its truth or falsity* concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office." (emphasis added).

With respect to false statements in general, Justice Alito has observed that the United States Supreme Court has repeatedly made clear that such statements "possess no intrinsic First Amendment value." *United States v. Alvarez*, 132 S. Ct. 2537, 2560-61 (2012) (Alito, J., dissenting).[19] Further, the United States Supreme Court has stated

---

prohibition on misleading or deceptive speech, or which contains material misrepresentations or omissions); *In re O'Toole*, 24 N.E.3d 1114 (Ohio 2014).

[19] Citing *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 612, 123 S. Ct. 1829, 155 L.Ed.2d 793 (2003) ("Like other forms of public deception, fraudulent charitable solicitation is unprotected speech"); *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 531, 122 S. Ct. 2390, 153 L.Ed.2d 499 (2002) ("[F]alse statements may be unprotected for their own sake"); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52, 108 S. Ct. 876, 99 L.Ed.2d 41 (1988) ("False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective"); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S. Ct. 1473, 79 L.Ed.2d 790 (1984) ("There is 'no constitutional value in false statements of fact'" (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974))); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743, 103 S. Ct. 2161, 76 L.Ed.2d 277 (1983) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech"); *Brown v. Hartlage*, 456 U.S. 45, 60, (continued . . .)

28

"[t]hat speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is . . . at odds with the premises of democratic government[.]" *Garrison*, 379 U.S. at 75. Nevertheless, prohibitions on false statements must still contain sufficient proof requirements to avoid infringing on protected speech:

> [I]n order to prevent the chilling of truthful speech on matters of public concern, we have held that liability for the defamation of a public official or figure *requires proof that defamatory statements were made with knowledge or reckless disregard of their falsity. . . .* All of these proof requirements inevitably have the effect of bringing some false factual statements within the protection of the First Amendment, but this is justified in order to prevent the chilling of other, valuable speech.

*Alvarez,* 132 S. Ct. at 2563-64 (emphasis added). Accordingly, prohibitions on knowingly or recklessly false statements by judicial candidates have been universally upheld and found not to infringe on First Amendment rights. Most recently, in *Winter,* the Sixth Circuit found a false statement ban identically worded to our Rule 4.1(A)(9) to

---

102 S. Ct. 1523, 71 L.Ed.2d 732 (1982) ("Of course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements"); *Herbert v. Lando*, 441 U.S. 153, 171, 99 S. Ct. 1635, 60 L.Ed.2d 115 (1979) ("Spreading false information in and of itself carries no First Amendment credentials"); *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S. Ct. 1817, 48 L.Ed.2d 346 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake"); *Gertz, supra*, at 340, 94 S. Ct. 2997 ("[T]he erroneous statement of fact is not worthy of constitutional protection"); *Time, Inc. v. Hill*, 385 U.S. 374, 389, 87 S. Ct. 534, 17 L.Ed.2d 456 (1967) ("[T]he constitutional guarantees [of the First Amendment] can tolerate sanctions against calculated falsehood without significant impairment of their essential function"); *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection").

29

be constitutional on its face. 834 F.3d 681. The *Winter* court, citing Kentucky's interest in "preserving public confidence in the honesty and integrity of its judiciary," found that its ban on false statements was narrowly tailored to meet that compelling interest. *Id.* at 693. In reaching that conclusion, the court succinctly stated "[t]he narrowest way to keep judges honest during their campaigns is to prohibit them from consciously making false statements about matters material to the campaign. This canon does that, and does it clearly." *Id.*

Likewise, the Ohio Supreme Court reformulated its prohibition on false statements by judicial candidates to apply only to knowingly or recklessly made false statements such that it would not run afoul of the First Amendment. In *O'Toole*, the Ohio Supreme Court observed that banning false statements did not circumvent "free debate" because "intentional lying is *not* inevitable in free debate" and that "[l]ies do not contribute to a robust political atmosphere." 24 N.E.3d at 1126 (emphasis in original). The Court found that a rule with such narrow scope, applicable only to speech made

> during a specific time period (the campaign), conveyed by specific means (ads, sample ballots, etc.), disseminated with a specific mental state (knowingly or with reckless disregard) and with a specific mental state as to the information's accuracy (with knowledge of its falsity or with reckless disregard as to its truth or falsity)

was plainly constitutional. *Id.* *Accord Myers v. Thompson*, 192 F. Supp. 3d 1129 (D. Mont. 2016) (denying preliminary injunction because candidate unlikely to succeed on merits of constitutional challenge to Rule prohibiting judicial candidate from making

30

false statement); *Butler*, 802 So.2d 207 (acknowledging constitutionality of restriction on judicial candidate speech where statements are made with knowing or reckless disregard of falsity); *In re Chmura*, 626 N.W.2d 876, 883 (Mich. 2001) ("[W]e believe that a rule . . . prohibiting a judicial candidate from only knowingly or recklessly making a false communication, strikes a reasonable constitutional balance between the candidate's First Amendment rights and the state's interest in preserving the integrity of the judicial system."); *Donohoe*, 580 P.2d at 1097 (rejecting First Amendment challenge to restriction on judicial candidate's speech where statement made with "knowledge of its falsity").

Moreover, in assessing the First Amendment's protections to the speech of a judicial candidate, courts have noted the categorical inapplicability of the adage that the "remedy for misleading speech is more speech, not less." *Winter v. Wolnitzek*, 56 F. Supp. 3d 884, 898 (E.D. Ky. 2014) (citing *Whitney v. California*, 274 U.S. 357, 377, (1927) (Brandeis, J., concurring)). As the court observed in *Myers*, "[w]hile counterspeech may be a strong alternative in the political election context, . . . [counterspeech] does not work to enhance the compelling State interest in judicial elections[.]" 192 F. Supp. 3d at 1140. The reason for this is obvious. While counterspeech may correct any misapprehensions about the subject of the false speech, *i.e.* the judicial opponent, it does nothing to restore erosion of the public's confidence in the judicial system as an institution, which occurs when its candidates spread falsehoods. As well-stated by the *Myers* court:

31

> Counterspeech is the best argument to explore falsehoods in speech about ideas and beliefs. Counterspeech is the cure to hate speech, to subversive speech, or to disagreeable political ideas or policies. Counterspeech is not a remedy to a systemic challenge that is false and undermines the public's confidence in the third branch of government.

*Id*. at 1141.

Furthermore, judicial candidates may be unable to adequately respond to false attacks with "more speech" because of the very restrictions their opponent refused to honor—the Code of Judicial Conduct. "[B]ecause their conduct is governed by [the Code of Judicial Conduct] . . . . [j]udicial candidates cannot always use 'channels of effective communication' to rebut misleading statements made about them and should not be left in the vulnerable position of fighting a political battle with one hand tied behind their backs." Long, *supra* at 815 (quoting *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 344 (1974)). In this particular case, as the Board and Judge Johnson correctly noted, Judge Johnson "could not make public statements that, contrary to what was being represented by [Judge-Elect Callaghan], that he did not support policies which might have a negative impact on coal employment in Nicholas County, because the Code of Judicial Conduct would preclude such statements[.]" A judicial candidate should not be left with the Hobson's choice of leaving false attacks unrequited or following his or her opponent into the ethical minefield of judicial counter-speech.

Therefore, as pertains to false speech made with knowledge of or reckless disregard as to its falsity, those portions of our Rules clearly pass constitutional muster.

32

We therefore hold that insofar as West Virginia Code of Judicial Conduct Rule 4.1(A)(9) and West Virginia Rule of Professional Conduct 8.2(a) prohibit lawyers, judges and judicial candidates from knowingly, or with reckless disregard for the truth, making a false statement as more fully proscribed therein, they are facially constitutional under the First Amendment to the United States Constitution. Likely in view of the fact that our Rules mirror countless other such ethical prohibitions which have been found facially constitutional, we observe that the tenor of Judge-Elect Callaghan's argument focuses largely on his "as-applied" challenge.

2. *Constitutionality of Rule 4.1(A)(9)and Rule 8.2(a) As-Applied*

In that regard, Judge-Elect Callaghan maintains that Rule 4.1(A)(9) and Rule 8.2(a) are unconstitutional as applied to the speech contained in the flyer inasmuch as the flyer is objectively true, substantially true and/or contains rhetorical hyperbole or parody. In effect, he claims that the flyer is not actionably "false" in the first instance.[20] We now turn to the substance of the flyer to resolve these issues.

---

[20] Judge-Elect Callaghan does not challenge the Board's conclusion that the allegedly false statements were made "knowingly" or with "reckless disregard." We therefore find it unnecessary to discuss this aspect of the violations in any detail. We agree with the Board that the evidence demonstrates that he was fully aware of the information which was utilized to craft the flyer and admitted as much.

Judge-Elect Callaghan first argues that the opening statement of the flyer—

"Barack Obama & Gary Johnson Party at the White House . . ."—is merely a "colorful

way" of saying that Judge Johnson attended an event at the White House and that it was

"not intended to be taken literally." As such, he argues that the statement is rhetorical

hyperbole or parody. With respect to such purported "colorful" speech, the First

Amendment does in fact protect speech which contains

> parody, fantasy, rhetorical hyperbole, and imaginative
> expressions, "that cannot 'reasonably [be] interpreted as
> stating actual facts' about an individual[.]" Because no
> reasonable person would take these types of speech as true,
> they simply cannot impair one's good name. "This provides
> assurance that public debate will not suffer for lack of
> 'imaginative expression' or the 'rhetorical hyperbole' which
> has traditionally added much to the discourse of our Nation."

*Mink v. Knox*, 613 F.3d 995, 1005 (10th Cir. 2010) (internal citations omitted) (quoting

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

First, Judge-Elect Callaghan perfunctorily suggests that this aspect of the

flyer is "parody." To support this contention, he briefly refers to the flyer as "harken[ing]

back to the 'beer summit' between Harvard University Professor Henry Louis Gates and

Sergeant James Crowley[.]"[21] The United States Supreme Court has explained that

---

[21] In 2009, Harvard professor Henry Louis Gates, an African-American, was arrested for disorderly conduct by Sergeant James Crowley, a Caucasian police officer, upon Sergeant Crowley's belief that Mr. Gates was breaking and entering into what turned out to be his own home. In an attempt to address racial tensions heightened by (continued . . .)

> [p]arody's humor, or in any event its comment, necessarily springs from *recognizable allusion* to its object through distorted imitation. Its art lies in the tension between a known original and its parodic twin. *When parody takes aim at a particular original work, the parody must be able to "conjure up" at least enough of that original to make the object of its critical wit recognizable.*

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 588 (1994) (emphasis added) (quoting *Elsmere Music, Inc. v. Nat'l Broad. Co. Inc.*, 623 F.2d 252, 253 n.1 (2d Cir. 1980)); *see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 494 (2d Cir. 1989) ("A parody must convey two simultaneous—and contradictory— messages: that it is the original, but also that it is *not* the original and is instead a parody.").

We may dispense with this argument in short order. Under any common understanding of the concept of "parody," a parodist creates a facsimile of an original image, event, person, etc. and alters it in a manner that distinguishes it from the original for the purpose of humor, commentary, etc. The *sine qua non* of parody is a recognition of that which it purports to parody. Using the language of the United States Supreme Court, the subject flyer lacks a "reasonable allusion" to *any* object, person, or event, much less the event posited by Judge-Elect Callaghan. There is nothing whatsoever in the flyer which can be fairly characterized as being reminiscent of the so-called "beer summit," nor does he explain in what manner it purports to parody it. The "beer summit"

---

this event, President Obama invited the men to the White House to meet in the White House garden in what was then characterized as a "beer summit."

35

moniker was derived of a well-publicized photograph of President Obama, Vice President Biden, Mr. Gates, and Sergeant Crowley sitting around a table in the White House gardens, each with a mug of beer in front of them. Aside from what appears to be a pilsner glass of beer depicted near the image of President Obama on the flyer, there is literally no similarity between the events or depictions, much less a "recognizable allusion."

Turning now to Judge-Elect Callaghan's more substantial contention that this aspect of the flyer is mere "rhetorical hyperbole," the Supreme Court has instructed that rhetorical hyperbole results when the speaker offers speech which cannot "reasonably [be] interpreted as stating actual facts about the [individual] involved." *Hustler*, 485 U.S. 46, 50 (1988). Therefore, we must determine if that portion of the subject flyer indicating that Judge Johnson "part[ied]" with President Obama at the White House could reasonably be interpreted as stating actual facts about Judge Johnson; if so, it does not qualify as rhetorical hyperbole. *See also Milkovich,* 497 U.S. at 23-24 (Brennan, J., dissenting) ("[T]he 'statement' that the plaintiff must prove false . . . is not invariably the literal phrase published but rather what a reasonable reader would have understood the author to have said."); *Greenbelt Coop. Publ'g Ass'n, Inc., v. Bresler*, 398 U.S. 6, 14 (1970) (characterizing speech as rhetorical hyperbole where "even the most careless reader must have perceived" it as such). Moreover, "[c]ontext is crucial and can turn what, out of context, appears to be a statement of fact into 'rhetorical hyperbole,'

36

which is not actionable." *Ollman v. Evans*, 750 F.2d 970, 1000 (D.C. Cir.1984) (*en banc*) (Bork, J., concurring). As further instruction, we are mindful that

> [a]lthough rhetorically hyperbolic statements may "at first blush appear to be factual[,] . . . they cannot reasonably be interpreted as stating actual facts about their target." Where rhetorical hyperbole is employed, the language itself "negate[s] the impression that the writer was seriously maintaining that [the plaintiff] committed the [particular act forming the basis of the alleged defamation]."

*Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378–79 (S.D. Fla. 2006) (citations omitted).

In spite of Judge-Elect Callaghan's contention that "the idea that the President of the United States would 'party' with a Nicholas County Circuit Court Judge is ridiculous on its face," we can perceive of no reason why Judge Johnson *could not* have been invited to the White House by President Obama or on his behalf to what could be characterized as a "party" "in support of" the President's "legislative agenda" as stated on the flyer. As explained above, Judge Johnson was involved in initiatives receiving federal funding and oversight, such as could theoretically come within the ambit of matters for which the President may choose to gather, honor, or entertain such individuals. Certainly individuals from all walks and of various repute are frequently visitors to The White House and/or guests of the President. The notion that those who do so are occasionally treated to receptions, cocktail parties, or the like is similarly not unheard of or incredible on its face. Quite the contrary, the idea of a long-time, distinguished sitting circuit judge attending a function at the White House at the

37

invitation of the President–for whatever reason and however that may come about–is imminently reasonable and believable. Frankly, it is undoubtedly because it is so believable—and when viewed in connection with the purported hardships being experienced in Nicholas County, potentially incendiary—that Judge-Elect Callaghan and his campaign consultant found it compelling campaign fodder. In this instance, however, it simply did not occur. We therefore conclude that this statement could reasonably be perceived as stating actual facts about Judge Johnson and therefore reject Judge-Elect Callaghan's contention that this aspect of the subject flyer was mere hyperbole deserving of First Amendment protection.

### b.      The Objective and/or Substantial Truth of the Flyer

As to the remainder of the flyer, Judge-Elect Callaghan examines each particular phrase in isolation, arguing that each is either substantially or objectively true. First, he argues that the remainder of the headlining statement regarding Obama and Johnson partying at the White House—"while Nicholas County loses hundreds of jobs"—is substantially true. He argues that Judge Johnson attended the conference at a time when Nicholas County was losing jobs.[22] As to the mock "Layoff Notice," he argues that the phrase "While Nicholas County lost hundreds of jobs to Barack Obama's coal policies . . ." is opinion. He argues that the remainder—"Judge Gary Johnson accepted an invitation from Obama to come to the White House to support Obama's

---

[22] As the Board noted, however, the job losses cited in the flyer occurred over a four-year period preceding Judge Johnson's attendance at the meeting and conference.

legislative agenda"—is true because the conference occurred a couple of weeks after Obama signed the Justice for Victims of Trafficking Act of 2015, which was a part of Obama's legislative agenda. As to the remaining sentence stating "That same month, news outlets reported a 76% drop in coal mining employment" he argues that it is also objectively true given a June 17, 2015, article admitted into evidence which states that Nicholas County lost 558 jobs representing a 76% drop in coal mining employment. Finally, he argues that the last portion stating "Can we trust Judge Gary Johnson to defend Nicholas County against job-killer Barack Obama?" is merely a rhetorical question.

Despite Judge-Elect Callaghan's attempt to finely parse the flyer into discrete, palatable bits of objective or "substantial" truth, the United States Supreme Court has stated that this Court must examine "'the substance, the gist, the sting'" of the communication as a whole to determine falsity. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (quoting *Heuer v. Kee*, 59 P.2d 1063, 1064 (Cal. Dist. Ct. App. 1936)). Critically, the Supreme Court has instructed that a communication is considered false if it has "'*a different effect on the mind of the reader from that which the pleaded truth would have produced.*'" *Id*. (quoting R. Sack, Libel, Slander, and Related Problems 138 (1980)) (emphasis added). This Court long ago adopted precisely this standard as pertains to the concept of "falsity" in the parallel libel and defamation contexts:

> The law . . . takes but one approach to the question of falsity, regardless of the form of the communication. It overlooks minor inaccuracies and concentrates upon

39

substantial truth. Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the [] charge be justified. A statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced.

Syl. Pt. 4, in part, *State ex rel. Suriano v. Gaughan*, 198 W.Va. 339, 480 S.E.2d 548 (1996). Other courts agree with and have utilized this analysis when assessing the falsity of a judicial candidate's speech. *See Chmura*, 626 N.W.2d at 887 ("The communication as a whole must be analyzed [and] . . . . [i]f 'the substance, the gist, the sting' of the communication is false, then it can be said that the judicial candidate 'used or participated in the use of a false communication.'").

Typically this so-called "substantial truth doctrine" inures to the benefit of the accused, *i.e.* if something is "substantially" true in overall effect, minor inaccuracies or falsities will not create falsity. However, in this particular instance, it works to Judge-Elect Callaghan's detriment because "the substance, the gist, the sting" of the communication, taken as a whole, is patently false. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000) (collecting cases which "represent the converse of the substantial truth doctrine" because they "convey a substantially false and defamatory impression"). As the *Turner* court explained, "a publication can convey a false and defamatory meaning by omitting or juxtaposing facts[.]" *Id.* at 114.

We find that merely peppering the latter portion of the flyer with statistical facts about job losses in Nicholas County does not elevate the flyer as a whole to the

level of "substantially true." Nor does the narrow fact that Judge Johnson did in fact attend a federal seminar and meeting make the statement that he "accepted an invitation from Obama to come to the White House" substantially true. There can be little question that the truth, *i.e.* that Judge Johnson merely attended a federally-required meeting and seminar, would produce a "different effect on the mind of the reader" than what the flyer conveys, *i.e.* that Judge Johnson was invited by and socialized with President Obama. [23]

Distilled to its essence, the ultimate question presented to this Court is whether the flyer is "false" and therefore stripped of First Amendment protection, or, as Judge-Elect Callaghan insists, merely the juxtaposition of two attenuated occurrences— coal job losses in Nicholas County and Judge Johnson's attendance at a federal seminar in Washington, which was "hyperbolized" as "partying" at the White House. We conclude that the "gist" of the subject flyer conveys that Judge Johnson "partied with Obama" at his personal invitation and is therefore simply too far afield from the truth to

---

[23] In its recommended decision, the Board focuses its "falsity" discussion heavily on the fact that the job losses referenced in the flyer preceded Judge Johnson's attendance at the seminar and the fact that the seminar had nothing to do with "coal-killing" legislative policies of President Obama. However, we find that the upshot of the flyer is, as Judge Johnson put it, that he was "fiddling while Rome burned," *i.e.* he was "partying" in Washington at the invitation of and with President Obama while Nicholas Countians were struggling with job losses. Collaterally, Judge-Elect Callaghan and Mr. Heflin may have hoped that recipients of the flyer would also presume that the "legislative agenda" that yielded the invitation and which Judge Johnson was "partying" in support of was related to the President's "coal-killing" policies and therefore was directly related to the job losses. That is certainly a reasonable implication from the text of the flyer. However, we find that the flyer is false on a more fundamental level as described herein.

41

be considered protected, hyperbolic free speech; it is, in every sense, materially false. Judge Johnson attended a federally-required meeting and conference in furtherance of his service to the State, which meeting and conference was utterly devoid of any meaningful connection to or interaction with the President. Judge Johnson's attendance at the meeting and conference is exaggerated, repurposed and mischaracterized to the point that it is rendered patently untrue. When viewed in its entirety as instructed by various courts, we have little difficulty finding that the subject flyer contains knowingly, materially false statements in violation of the Code of Judicial Conduct and the Rules of Professional Conduct.

We therefore conclude that the First Amendment does not serve to shield Judge-Elect Callaghan from discipline as a result of the subject flyer. We further conclude, as did the Board, that the subject flyer contains a knowingly false statement and that Judge-Elect Callaghan's actions in approving and disseminating the flyer are therefore violative of Rule 4.1(A)(9), Rule 4.2(A)(1), Rule 4.2(A)(4) of the Code of Judicial Conduct and Rule 8.2(a) of the West Virginia Rules of Professional Conduct.

## C. *Discipline*

In addition to his assertions regarding jurisdictional issues and First Amendment concerns, Judge-Elect Callaghan also contends that the sanctions recommended by the Judicial Hearing Board are excessive. As referenced above, "[t]he purpose of judicial disciplinary proceedings is the preservation and enhancement of

42

public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." *Gorby*, 176 W.Va. at 16, 339 S.E.2d at 702. The objective of any judicial disciplinary proceeding must be to "preserve public confidence in the integrity and impartiality of the judiciary." *In re Wilfong*, 234 W. Va. 394, 407, 765 S.E.2d 283, 296 (2014).

Consistent with that goal, "[t]his Court has the inherent power to inquire into the conduct of justices, judges and magistrates, and to impose any disciplinary measures short of impeachment that it deems necessary to preserve and enhance public confidence in the judiciary." Syl. Pt. 8, *In re Watkins*, 233 W.Va. 170, 172, 757 S.E.2d 594, 596 (2013). In pertinent part of syllabus point seven of *Watkins*, this Court also explained "[i]t is clearly within this Court's power and discretion to impose *multiple sanctions* against any justice, judge or magistrate for *separate and distinct violations* of the Code of Judicial Conduct and to order that such sanctions be imposed consecutively." *Id*. (emphasis supplied). This authority, as referenced above, is derived from article VIII, section 8 of the West Virginia Constitution.

> Pursuant to article VIII, section 8 of the *West Virginia Constitution*, this Court has the inherent and express authority to "prescribe, adopt, promulgate and amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and magistrates, along with sanctions and penalties for any violation thereof[.]"

Syl. Pt. 5, *Committee On Legal Ethics v. Karl*, 192 W.Va. 23, 449 S.E.2d 277 (1994); *see also* Syl. Pt. 1, *West Virginia Judicial Inquiry Comm'n v. Dostert*, 165 W.Va. 233, 271

43

S.E.2d 427 (1980) ("The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings.").

The parameters of potential discipline in this proceeding are governed by Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure.[24] Pursuant to Rule 4.12,

> [t]he Judicial Hearing Board may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the Code of Judicial Conduct: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement for a judge because of advancing years and attendant physical or mental incapacity and who is eligible to receive retirement benefits under the judges' retirement system or public employees retirement system . . . . Any period of suspension without pay shall not interfere with the accumulation of a judge's retirement credit and the State shall continue to pay into the appropriate

---

[24] We also emphasize the significance of Rule 1 of the West Virginia Rules of Judicial Disciplinary Procedure, providing:

> The ethical conduct of judges is of the highest importance to the people of the State of West Virginia and to the legal profession. Every judge shall observe the highest standards of judicial conduct. In furtherance of this goal, the Supreme Court of Appeals does hereby establish a Judicial Investigation Commission to determine whether probable cause exists to formally charge a judge with a violation of the Code of Judicial Conduct promulgated by the Supreme Court of Appeals to govern the ethical conduct of judges or that a judge because of advancing years and attendant physical and mental incapacity, should not continue to serve.

44

retirement fund the regular payments as if the judge were not under suspension without pay. . . .

In addition, the Judicial Hearing Board may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a judge's violation of the Rules of Professional Conduct: (1) probation; (2) restitution; (3) limitation on the nature or extent of future practice; (4) supervised practice; (5) community service; (6) admonishment; (7) reprimand; (8) suspension; or (9) annulment.

*See also In re Toler*, 218 W.Va. 653, 625 S.E.2d 731 (2005).

In the matter sub judice, the Judicial Hearing Board concluded the evidence established three separate and distinct violations of the Code of Judicial Conduct, specifically Rules 4.1(A)(9), 4.2(A)(1), and 4.2(A)(4). The Board also found one violation of the Rules of Professional Conduct, specifically Rule 8.2(a). The Hearing Board recommended the following sanctions: (1) censure as a judicial candidate and as a lawyer; (2) concurrent suspension from serving as a judge and from practicing law for one year; (3) fine of $5,000 for each of the three Code of Judicial Conduct violations, for a total of $15,000; and (4) payment of costs related to the three violations of the Code of Judicial Conduct and one violation of the Rules of Professional Conduct.

Judge-Elect Callaghan objects to what he characterizes as excessive and unjustified recommended sanctions. He contends that the dissemination of the flyer played a very minor role in his successful campaign and maintains that a suspension is not justified, arguing that admonishments, reprimands, censures, and fines have been

45

deemed more appropriate in other cases of this nature. The Office of Disciplinary Counsel likewise disagrees with the Board's recommended sanctions and asserts that the severity of Judge-Elect Callaghan's violations warrants the attorney and judicial suspensions to be served consecutively, resulting in two years of suspension. Having thoroughly evaluated all arguments asserted in the briefs of this matter, the determinations of this Court are presented below.

### 1. Factors to be Examined in Determinations of Discipline

An extensive consideration of the appropriate discipline for Judge-Elect Callaghan's violations of both the Code of Judicial Conduct and the Rules of Professional Conduct requires this Court to examine the factors enunciated in syllabus point three of *In re Cruickshanks*, 220 W.Va. 513, 648 S.E.2d 19 (2007):

> Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

Utilizing the framework for analysis outlined in *Cruickshanks*, this Court first finds that Judge-Elect Callaghan's conduct relates directly to the administration of justice and negatively impacts the public's perception of the administration of justice. Second, the behavior certainly relates directly to his public persona, through his efforts to achieve professional gain by dissemination of false materials to the voting public. Third, his actions demonstrate profound disrespect and disregard for our system of justice; his intentional utilization of falsehoods subverts the very essence of the integrity of the judicial system and casts serious doubt upon his fitness for a judicial position established upon unbiased veracity and incorruptibility. [25]

Continuing in our examination of the *Cruikshanks* factors, while we recognize that Judge-Elect Callaghan has not been criminally indicted for his actions, we must also examine other issues which might be considered as mitigating or aggravating factors. The Hearing Board observed the following mitigating factors: Judge-Elect Callaghan has not been the subject of prior disciplinary complaints; Judge Johnson had referenced his seminar attendance on his campaign's Facebook page; Judge-Elect Callaghan acted quickly in taking corrective measures to address Disciplinary Counsel's

---

[25] The practice of intentional dissemination of false information to the public strikes the very essence of fundamental judicial principles. "[D]eception is antithetical to the role of a Judge who is sworn to uphold the law and seek the truth." *Matter of Collazo*, 691 N.E.2d 1021, 1023 (N.Y. 1998) (quotation omitted); *see also* William P. Marshall, *False Campaign Speech and the First Amendment*, 153 U. Pa. L. Rev. 285, 287 (2004) (arguing that effects of false campaign speech "can be as corrosive as the worst campaign finance abuses").

concerns about the subject flyer; he expressed regret that the flyer had caused others consternation; and he cooperated with Disciplinary Counsel in the investigation.

Upon *de novo* review by this Court, we find somewhat limited mitigation in this case. A valid mitigating factor is Judge-Elect Callaghan's lack of a prior disciplinary record. Likewise, his cooperation with the investigation of the charges against him is a mitigating factor; his full and free disclosure is laudable.

With regard to his attempts at corrective measures and his level of regret, however, we find that although he removed the false assertions from his personal and campaign Facebook pages and ran radio advertisements ostensibly retracting the assertions contained in the flyer, the calculated and intentional timing of his mailings rendered it virtually impossible to engage in meaningful mitigation. As Judge Johnson testified, time constraints prevented him from taking meaningful action in response to the distribution of the flyer.[26] Nicholas County's only newspaper was a weekly paper, and the timing of the mailing prevented inclusion of any response or countermeasure in that

---

[26] A somewhat similar circumstance was remarked upon in *In re Hildebrandt*, 675 N.E.2d 889 (Ohio 1997), noting "the record indicates that the advertisements in question were timed to appear on radio and television two to three weeks prior to the election, thus providing complainant little time to respond publicly to the misstatements or seek redress prior to the election. . . ." *Id*. at 891.

48

paper.[27] Thus, we find that the removal of the assertions from social media and the radio statements are entitled to limited weight in mitigation.[28]

The Hearing Board references extensive aggravating factors, asserting that Judge-Elect Callaghan acted with a selfish motive; some portion of the electorate may perceive his actions as "stealing the election;" the charges relate to his standing as a judicial officer who used false advertising to get elected and has implied that he will rule in a manner that may impact the local coal industry; he created a false reality and communicated it to the public through polling and campaign flyers; he timed the release of the flyer in a manner which effectively eliminated Judge Johnson's ability to "undo the damage;" his remedial efforts used language that did not convey authentic regret; and he used other campaign materials to disseminate false or misleading information.

Upon review, this Court is compelled to conclude that the record is replete with examples of Judge-Elect Callaghan's extremely limited remorse. Even in his

---

[27] We note the inherent difficulty of responding to false speech in any instance, even where time constraints are not present. False speech "interfere[s] with the truth-seeking function of the marketplace of ideas, and [it] cause[s] damage . . . that cannot easily be repaired by counterspeech, however persuasive or effective." *Hustler*, 485 U.S. at 52 (citing *Gertz*, 418 U.S. at 340, 344 n.9). It has also been observed that the "truth rarely catches up with a lie." *Gertz*, 418 U.S. at 344 n.9.

[28] We do not find the other factor mentioned by the Board to be worthy of appreciable consideration in mitigation of these violations. Judge Johnson's reference to his seminar attendance on his campaign's Facebook page, while indeed relevant in proving the truth of such attendance, in no manner reduces the impact of the violations at issue.

meager attempt at mitigation, his comments potentially qualifying as retraction demonstrated an absence of a thorough understanding of the inappropriateness of his actions. In the radio ads, as referenced above, the following statement was made: "[P]lease understand that the specific characterization of the White House visit *may* be inaccurate and misleading and should not have been sent containing inappropriate information. Candidate Callaghan apologizes for any *misunderstanding* or inaccuracies. . . ." (Emphasis added). As the Supreme Court of Arizona appropriately remarked in *In re Augenstein*, 871 P.2d 254 (Ariz. 1994), "[t]hose seeking mitigation relief based upon remorse must present a showing of more than having said they are sorry." *Id.* at 258 (quotation and alteration omitted).

Judge-Elect Callaghan's subsequent statements during his testimony continued to reveal a dismissive and cavalier attitude toward his behavior. He stated, "If I had to do it again, I probably would not approve the flier going out just because it's not enjoyable - politics is not enjoyable in a lot of different ways, but when you cause outrage in somebody, that, I regret." Moreover, his written response to the initial complaint disingenuously urges that "[s]ome members of the public may have been duly impressed by the fact that Judge Johnson was honored by the White House for the good works he had performed[.]" He further suggested that Judge Johnson could have "easily . . . boycotted this meeting, based upon his disagreement with President Obama's policies, and he could have publicized such a boycott for political purposes." In his testimony before the Board, Judge-Elect Callaghan minimized his conduct, stating

50

> The Johnson campaign - I described before - they got their mileage out of this flier. . . . [W]hen the retraction came out, on Judge Johnson's campaign Facebook page they formed what I called the Callaghan lynch mob, and they called me a liar, dishonest, unethical, despicable, dirty politician - just anything you can think of. So they got their mileage, not only out of the flier but out of my retraction in calling me all those names. . . . I think I would've beat Judge Johnson by more votes without that flier because of the negative reaction that it got and the negative comments that were created from it.

(emphasis added). Flippantly attempting to dismiss the voter effect of the direct-mail flyer, he further testified "these fliers barely warrant a glance on the short trip from the mailbox to the trash can," allegedly quoting a local reporter.

As a further example of aggravating factors, the Hearing Board references the alleged falsities contained in other campaign materials disseminated by Judge-Elect Callaghan. The Board emphasizes that after he presented these flyers during the hearing and sought to have them introduced into evidence, they were ultimately submitted as joint exhibits. He was not, however, charged with any ethical violation based upon those additional materials. Consequently, this Court does not base its determination of appropriate discipline on the existence of those materials, either as actual violations or as aggravating factors.[29] While the Board seeks consideration of these matters as indicative

---

[29] The utilization of uncharged allegations of misconduct as an aggravating factor enhancing sanctions must be approached with caution, particularly in an arena in which First Amendment rights to freedom to engage in campaign speech are asserted. As the Supreme Court of Minnesota observed in *In re Disciplinary Action against Tayari-Garrett*, 866 N.W.2d 513 (Minn. 2015), due process protections are implicated and (continued . . .)

51

of a pattern of ethical misconduct, this Court finds it unnecessary to consider those uncharged alleged violations to support or enhance the discipline imposed in this case. Our conclusions are premised exclusively upon the four charges properly levied against Judge-Elect Callaghan and proven by clear and convincing evidence.[30]

### 2. *Precedential Analysis of Violations of Code of Judicial Conduct*

Where violations of ethical rules occur, it is incumbent upon this Court to impose appropriate sanctions. This Court has recognized that a determination of discipline must be premised upon the unique facts of each individual case. *See McCorkle*, 192 W.Va. 286, 452 S.E.2d 377. Mindful of the interplay between the roles of lawyer and judge, this Court stated as follows in *Karl*:

> It is important for us to emphasize that a judge is first and foremost a lawyer. While acting as a lawyer, he or she is charged with the knowledge or the standards of conduct

---

are weakened if the referee is permitted to consider uncharged violations of the Minnesota Rules of Professional Conduct under the guise of aggravating factors instead of requiring that allegations of additional misconduct be brought in a supplementary petition. However, we need not decide whether the referee clearly erred by finding either of these aggravating factors because their existence does not affect the discipline we impose in this case.

*Id.* at 520 n.4.

[30] If the Office of Disciplinary Counsel believes it is appropriate to formally charge Judge-Elect Callaghan for the violations allegedly committed by the dissemination of those additional materials, that office is competent to further investigate those matters, based upon the guidance provided by this opinion.

52

defined in the *West Virginia Rules of Professional Conduct.* While acting as a judge, he or she is charged with the knowledge of the standards of conduct in the *West Virginia Code of Judicial Conduct.* Any behavior that reveals the lack of integrity and character expected of lawyers and judges within these standards warrants discipline. The *West Virginia Rules of Professional Conduct* and the *West Virginia Code of Judicial Conduct* serve as a unified system of discipline within the legal profession to achieve a common goal and that is to uphold high standards of conduct to secure and enhance the public's trust and confidence in the entire judicial system.

192 W.Va. at 33, 449 S.E.2d at 287.

While this Court has not had occasion to evaluate ethical violations in a factual scenario identical to the present case, we have encountered violations demanding serious response. For purposes of our analysis of Judge-Elect Callaghan's violations of the Judicial Code of Conduct, our reasoning in prior judicial discipline cases is instructive. In *Watkins*, for instance, this Court suspended a judge without pay for four years "until his present term of office ends on December 31, 2016" for his repeated intemperance with litigants and disrespect for authority. 233 W.Va. at 183, 757 S.E.2d at 607. This Court expressed grave concerns with the behavior of judges and the resultant effect upon public perception of the judiciary.

Citizens judge the law by what they see and hear in courts, and by the character and manners of judges and lawyers. "The law should provide an exemplar of correct behavior. When the judge presides in Court, he personifies the law, he represents the sovereign administering justice and his conduct must be worthy of the majesty and honor of that position." *Matter of Ross*, 428 A.2d 858, 866 (Maine 1981). Hence a judge must be more than independent and honest; equally important, a judge must be perceived by the public to be

independent and honest. Not only must justice be done, it also must appear to be done.

*Id.* at 182, 757 S.E.2d at 606 (footnote omitted). Interestingly, in *Watkins*, this Court also noted that more extensive disciplinary measures could have been imposed, based upon the number of ethical violations committed. The Court observed:

> The Hearing Board concluded that Judge Watkins had committed 24 separate violations of nine separate Canons of the *Code of Judicial Conduct*. Under the *Rules of Judicial Disciplinary Procedure*, the Hearing Board noted that for each violation it could recommend that this Court impose a maximum penalty of suspension for one year and a fine of up to $5,000, and that it could impose the penalties consecutively. *See* Rule 4.12(4) and (5), *Rules of Judicial Disciplinary Procedure*; Syllabus Point 5, *In re Toler*, 218 W.Va. 653, 625 S.E.2d 731 (2005). Hence, the Board could have recommended a maximum sanction against Judge Watkins of a 24-year suspension without pay plus a fine of $120,000.

233 W.Va. at 173, 757 S.E.2d at 597.[31] Under the particular facts in *Watkins*, however, the Court determined that a four-year suspension was adequate discipline for the violations.

In *Toler*, this Court suspended a magistrate for four years for sexual misconduct in a prior term, thus suspending him beyond his term in office. 218 W.Va. at

---

[31] By way of hypothetical analogy, a reviewing body might consider the violations herein charged to be premised upon each separate action, i.e., each posting and each item mailed. Similarly, charges possibly could have been calculated based upon the number of false assertions encompassed within the subject flyer. This Court addresses the charges as levied against Judge-Elect Callaghan by the Board and passes no judgment upon the efficacy or validity of alternate methods of calculation.

662, 625 S.E.2d at 740.   We found four separate and distinct acts and suspended the

magistrate one year for each, to run consecutively.   Sanctioning the magistrate for each

violation was deemed essential, based upon the following reasoning:

> Having found that Mr. Toler did, in fact, violate the Code of
> Judicial Conduct on at least four different occasions, in four
> completely separate and distinct situations, and against four
> separate individuals, it simply would make little or no sense
> to find in any other manner than to impose sanctions against
> Mr. Toler for each of the separate violations and to impose
> such sanctions consecutively.  Given the nature and extent of
> the misconduct in this case, to rule otherwise would diminish
> public confidence in the judiciary, impugn the judicial
> disciplinary process, and would have a chilling effect on the
> willingness of victims of domestic violence to seek help from
> the judicial system.

*Id*. at 661, 625 S.E.2d at 739.   "To hold a violator of the Code of Judicial Conduct who

has committed only one offense to the same exact standard and subject that offender to

the same sanctions as a violator who has committed four, five, or fifty separate acts of

misconduct would suggest unreasonable disparate treatment. . . ."   *Id*.   The Court

explained that it "must give proper consideration and weight to the severity of each of the

independent acts of judicial misconduct when deciding appropriate sanctions."   *Id*.

In *In re Wilfong*, 234 W.Va. 394, 765 S.E.2d 283 (2014), this Court

imposed a two-year suspension, censure, and costs upon a judge who maintained an

extra-marital affair with a corrections program director who regularly appeared in her

court.  In ruling on that issue, this Court explained:

> [T]his Court adopts the Hearing Board's finding that the
> judge committed eleven violations of seven Canons.  The

55

judge demeaned her office, and significantly impaired public confidence in her personal integrity and in the integrity of her judicial office. As a sanction, we hold that the judge must be censured; suspended until the end of her term in December 2016; and required to pay the costs of investigating and prosecuting these proceedings.

234 W.Va. at 397, 765 S.E.2d at 286.

As argued by Judge-Elect Callaghan and acknowledged by the Hearing Board and Office of Disciplinary Counsel, judicial campaign ethical violations, in this and other jurisdictions, have often resulted in minimal disciplinary measures, sometimes consisting only of fines, reprimands, or censures. For instance, in *In the Matter of Codispoti*, 190 W.Va. 369, 438 S.E.2d 549 (1993), this Court censured a magistrate for his direct involvement in his wife's campaign and for misleading advertisements appearing in a local newspaper. This Court found, however, an absence of clear and convincing evidence that the magistrate caused the advertisement to be published and therefore found that censure was an adequate sanction. *Id*. at 373, 438 S.E.2d at 553; *see also Matter of Tennant*, 205 W.Va. 92, 516 S.E.2d 496 (1999) (admonishing candidate for magistrate for solicitation of campaign funds); *Starcher*, 202 W.Va. 55, 501 S.E.2d 772 (admonishing judge for personally soliciting campaign contributions).

In our review of cases involving multiple facets of judicial discipline, we find the rationales employed in those cases instructive on principles underlying disciplinary determinations. In *In re Renke*, 933 So.2d 482 (Fla. 2006), for example, a successful judicial candidate was removed from office for "knowingly and purposefully"

56

making material misrepresentations in his campaign brochures, among other violations.

*Id*. at 487. The Supreme Court of Florida reasoned:

> [T]o allow someone who has committed such misconduct during a campaign to attain office to then serve the term of the judgeship obtained by such means clearly sends the wrong message to future candidates; that is, the end justifies the means and, thus, all is fair so long as the candidate wins. . . . In our decision to remove Judge Renke, we have concluded that the series of blatant, knowing misrepresentations found in Judge Renke's campaign literature and in his statements to the press amount to nothing short of fraud on the electorate in an effort to secure a seat on the bench. . . . [W]e hold that regardless of Judge Renke's present abilities and reputation as a judge, one who obtains a position by fraud and other serious misconduct, as we have found Judge Renke did, is by definition unfit to hold that office. . . . [T]hose who seek to assume the mantle of administrators of justice cannot be seen to attain such a position of trust through such unjust means.

*Id*. at 495 (citations and internal quotations omitted);[32] *see also In re McMillan*, 797 So. 2d 560 (Fla. 2001) (successful judicial candidate removed, in part, for unfounded attacks on opponent and local court system).

---

[32] In *Renke*, the Supreme Court of Florida also addressed a matter it had evaluated ten years prior to the *Renke* matter. Its discussion of that prior case is illuminating on the issue of progression of legal reasoning and sanctioning ability. In *In re Alley*, 699 So.2d 1369 (Fla. 1997), allegations of violations had been asserted against a candidate for judicial office, charging Judge Alley "with knowingly misrepresenting her qualifications and those of her opponent in her campaign literature, including mailers and newspaper advertisements." *Renke*, 933 So.2d at 494. The court, in a very brief *Alley* opinion, imposed only a public reprimand as discipline, based upon its limitations with regard to altering the recommendations of the Judicial Qualifications Commission. *Alley*, 699 So.2d at 1370. In *Renke*, the court took the opportunity to explain that it had been "constrained by the language . . . regarding our ability to modify the . . . proposed discipline" at the time of the *Alley* decision. 933 So.2d at 494. The court in *Renke* (continued . . .)

In *Tamburrino*, the Ohio Supreme Court suspended an unsuccessful judicial candidate from the practice of law for one year, with six months stayed, based upon false television advertisements, emphasizing "[t]his case does not involve false statements to merely make Tamburrino appear as though he had better credentials or more endorsements" as in several other arguably comparable judicial ethics cases. 2016 WL at *11. Rather, Tamburrino, similar to Judge-Elect Callaghan in the present situation, "used false statements to impugn the integrity of his opponent." *Id.* "Tamburrino's misconduct impugned the integrity of his opponent as a jurist and as a public servant." *Id.* at *12; *see also In re Kinsey*, 842 So.2d 77 (Fla. 2003) (reprimanding and fining judicial candidate, in part, for attacking opponent's handling of cases and presenting herself as pro-police and anti-criminal); *In re Baker*, 542 P.2d 701 (Kan. 1975) (censuring judicial candidate for authorizing campaign flyer containing false assertions regarding opponent's retirement eligibility); *In re Freeman*, 995 So.2d 1197 (La. 2008) (suspending justice of the peace without pay for remainder of term for failing to resign judicial office before becoming candidate for non-judicial office); *In Matter of Fortinberry*, 708 N.W.2d 96 (Mich. 2006) (censuring judicial candidate for falsely accusing opponent of having illicit affair with law clerk and asserting that candidate's wife was thereafter found dead in

---

observed that, in *Alley*, it had expressed "our frustration with the recommended discipline in that case, regarding violations similar to the ones we face today, stating, [in *Alley*], 'we find it difficult to allow one guilty of such egregious conduct to retain the benefits of those violations and remain in office.'" *Renke*, 933 So.2d at 494 (quoting *Alley*, 699 So.2d at 1370). Thus, in *Renke*, the court stated: "Today we make clear that those warnings cannot be ignored by those who seek the trust of the public to place them in judicial office." *Renke*, 933 So.2d at 495.

home); *In re Burick*, 705 N.E.2d 422 (Ohio 1999) (reprimanding and fining judicial candidate, in part, for misrepresenting facts about opponent in campaign communications); *Hildebrandt*, 675 N.E.2d at 892 (suspending judicial candidate for six months, with suspension stayed, and placing on probation for six months subject to candidate's compliance with terms of order, including public apology, for falsely accusing opponent of running for judge and for Congress).

### 3. *Precedential Analysis of Violations of Rules of Professional Conduct*

Our analysis of Judge-Elect Callaghan's violation of the Rules of Professional Conduct is also guided by our prior decisions of appropriate discipline of attorneys for false statements. In *Committee on Legal Ethics of West Virginia State Bar v. Farber*, 185 W. Va. 522, 408 S.E.2d 274 (1991), this Court suspended an attorney for three months, with readmission conditioned upon having a supervising lawyer for a period of two years. The attorney had misrepresented facts in a motion to disqualify a circuit judge and had made false accusations against the judge. 185 W.Va. at 525, 408 S.E.2d at 277. Similarly, in *Lawyer Disciplinary Board v. Turgeon*, 210 W.Va. 181, 557 S.E.2d 235 (2000), this Court suspended a lawyer for two years, in part, for falsely accusing a judge of manufacturing evidence and cooperating with the prosecution against a client. In *Hall*, this Court suspended an attorney for three months for falsely accusing an Administrative Law Judge of racial bias and unethical behavior. 234 W. Va. 298, 765 S.E.2d 187.

The discussion of such violations by other jurisdictions is also instructive. *See In re Becker*, 620 N.E.2d 691 (Ind. 1993) (suspending attorney thirty days for false claims against judge); *In re Ireland*, 276 P.3d 762 (Kan. 2012) (suspending lawyer two years for accusing judge of improper sexual behavior during mediation); *Kentucky Bar Assoc. v. Waller*, 929 S.W.2d 181 (Ky. 1996) (suspending lawyer six months for calling judge lying incompetent ---hole); *In re Mire*, 197 So.3d 656 (La. 2016) (suspending lawyer one year and one day with six months deferred by two years' probation for saying judge was incompetent); *In re McCool*, 172 So.3d 1058 (La. 2015) (disbarring lawyer for orchestrating media campaign based on false or misleading information in effort to intimidate judge); *Disciplinary Action Against Graham*, 453 N.W.2d 313 (Minn. 1990) (suspending lawyer sixty days for accusing judge, magistrate, and attorneys of conspiracy); *Mississippi Bar v. Lumumba*, 912 So.2d 871 (Miss. 2005) (suspending lawyer six months for saying judge had temperament of barbarian); *Disciplinary Counsel v. Shimko*, 983 N.E.2d 1300 (Ohio 2012) (imposing one year stayed suspension on lawyer who repeatedly questioned judge's impartiality); *Moseley v. Virginia State Bar*, 694 S.E.2d 586 (Va. 2010) (suspending lawyer six months, in part, for making false comments about judge).

### 4. Sanctions for Judge-Elect Callaghan's Violations

In this Court's analysis of the present matter and our determination of appropriate sanction, we recognize the limited precisely comparable precedent. Based upon our review of numerous infractions involving assertions of false statements by

judges and attorneys, however, we find it imperative to consider that Judge-Elect Callaghan did not simply misrepresent himself or issues such as his own qualifications or endorsements, his professional competence, or his campaign's monetary contributions. Rather, he directly and methodically targeted an opponent with fabricated material and disseminated it to the electorate. The perceived vulnerabilities in the opponent's campaign were exploited, based upon polls and research conducted on behalf of Judge-Elect Callaghan and with his approval. As Mr. Heflin explained the strategy, the attempt was "to create a piece of - - something humorous and something that would help create the theatre of the mind we were looking for."

Subsequent to thorough evaluation of this matter, this Court finds clear and convincing evidence of the violations set forth by the Board and adopts its recommendations, with modification. For his violation of Rule 4.1(A)(9), Rule 4.2(A)(1), and Rule 4.2(A)(4) of the Code of Judicial Conduct, we find that Judge-Elect Callaghan should be suspended for two years, without pay, from his position as Judge of the 28th Judicial Circuit.[33] For his violation of Rule 8.2(a) of the Rules of Professional Conduct, we find that Judge-Elect Callaghan should be reprimanded.

---

[33] The finding of three separate and distinct violations of the Code of Judicial Conduct could warrant a three-year suspension under Rule 4.12 of the West Virginia Rules of Judicial Disciplinary Procedure. Based upon our assessment of the various elements of Judge-Elect Callaghan's conduct, as well as aggravating and mitigating factors, we find a two-year suspension is adequate and warranted by the severity of the conduct. We also note that article VIII, section 7 of the West Virginia Constitution (continued . . .)

The imposition of this discipline, both suspension as a judge and reprimand as an attorney, is warranted by the severity of Judge-Elect Callaghan's conduct. The Court acknowledges the obligation to "respect and observe the people's categorical right to choose their own judges, and to avoid interfering with that right except for manifest violations of the Code of Judicial Conduct." *Turco*, 970 P.2d at 740. However, we find manifest violations have been committed in this case.[34] We have also observed "it is sometimes appropriate to discipline a judge both as a judge and as a lawyer for the same misconduct." *Matter of Troisi*, 202 W. Va. 390, 397, 504 S.E.2d 625, 632 (1998). This precept is artfully explained in *In re Mattera*, 168 A.2d 38 (N.J. 1961): "A single act of misconduct may offend the public interest in a number of areas and call for an appropriate remedy as to each hurt. . . . The remedies are not cumulative to vindicate a single interest; rather each is designed to deal with a separate need." *Id*. at 42. As this

---

prohibits a circuit court judge from practicing law during his term. *See also McDowell v. Burnett*, 75 S.E. 873, 878 (S.C. 1912) (suspension is "the mere temporary withdrawal of the power to exercise the duties of an office.").

[34] The significance of the elevated public position of a judge cannot be overstated. "Because their misconduct is undeniably more harmful to the public's perception of both the legal profession and the judiciary as a whole, judges must maintain standards of personal and professional care beyond that of regular attorneys." *In re Coffey's Case*, 949 A.2d 102, 129 (N.H. 2008). "Without judges who follow the law themselves, the authority of the rule of law is compromised." *Id*. at 132 (Galway, J., dissenting). In disagreeing with the majority's decision to impose a three-year suspension for Coffey's fraudulent conveyances and arguing for imposition of an indefinite suspension, the dissent posits: "Simply put, when one whose job it is to enforce the law, instead interferes with and disregards the law to her own benefit, the public rightfully questions whether the judicial system itself is worthy of respect." *Id*. at 130 (Galway, J., dissenting).

Court has stated: "In cases of judicial misconduct, more than a single interest is implicated." *Troisi*, 202 W. Va. at 397, 504 S.E.2d at 632.[35]

Judge-Elect Callaghan's conduct violated fundamental and solemn principles regarding the integrity of the judiciary.[36] His egregious behavior warrants substantial discipline.[37] While this Court remains mindful that sanctions are not for the purpose of punishment, this Court must impose discipline in appropriate measure to "instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society." *Karl*, 192 W.Va. at 34, 449 S.E.2d at 288 (internal quotations omitted). Moreover, "[a]ny sanction must be designed to announce publicly our recognition that there has been misconduct; it must be sufficient to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future." *Id.* (internal quotations omitted). We acknowledge Judge-Elect Callaghan's contention that significant sanctions would have "a devastatingly chilling effect on lawyers pondering the idea of running for a judicial office." In that vein, we sincerely expect that these sanctions will indeed have a

---

[35] *See also* Frank D. Wagner, Annotation, *Misconduct In Capacity As Judge As Basis For Disciplinary Action Against Attorney*, 57 A.L.R.3d 1150 (1974).

[36] "[H]onesty is the base line and mandatory requirement to serve in the legal profession." *Iowa Supreme Ct. Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 465 (Iowa 2014) (internal citations omitted).

[37] If Judge-Elect Callaghan had not been elected to the judicial seat, our consideration of the discipline to be imposed under the Rules of Professional Conduct may have differed.

devastatingly chilling effect on lawyers pondering the idea of disseminating falsifications for the purpose of attaining an honored position of public trust.

## IV. CONCLUSION

This Court imposes the following discipline upon Judge-Elect Callaghan:

1.      Judge-Elect Callaghan is reprimanded for violation of Rule 8.2(a) of the Rules of Professional Conduct.

2.      Judge-Elect Callaghan is forthwith suspended for two years, without pay, from his office as judge of the 28th Judicial Circuit, for his violations of Rules 4.1(A)(9), 4.2(A)(1), and 4.2(A)(4) of the Code of Judicial Conduct.

3.      Judge-Elect Callaghan is ordered to pay a $5,000 fine per violation of the Code of Judicial Conduct, for a total of $15,000 fine.

4.      Judge-Elect Callaghan is ordered to pay all costs associated with the investigation, prosecution, and appeal of the violations proven in these proceedings.

The Clerk of this Court is ordered to issue the mandate forthwith.

Suspension without pay and other sanctions ordered.

It is so Ordered.



Barack Obama & Gary Johnson Party at the White House.....

Paid for by: Callaghan for Judge 2016, Wayne Young Treasurer.

Steve Callaghan for Judge
600 Main Street
Summersville, WV 26651

PRST STD AUTO
U.S. POSTAGE PAID
CHARLESTON, WV
PERMIT NO. 1378

Exhibit A
Case No.16-0670
In the Matter of: Stephen Callaghan

...While Nicholas County loses hundreds of jobs.



## LAYOFF NOTICE

While Nicholas County lost hundreds of jobs to Barack Obama's coal policies, Judge Gary Johnson accepted an invitation from Obama to come to the White House to support Obama's legislative agenda. That same month, news outlets reported a 76% drop in coal mining employment.

Can we trust Judge Gary Johnson to defend Nicholas County against job-killer Barack Obama?

On May 10, Put Nicholas County First.

Vote for Steve Callaghan.